FILED

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

14 JUL 10 AM 11: 15

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS, FLORIDA

**WALTER MICHAELSON**

**Plaintiff,**

**Case No:** 2:14-cv-388-FtM-38CM

**vs.**

**UBS FINANCIAL SERVICES, INC.,**
**UBS BANK USA, INC.,**
**ERIC BEADLE,**
**SUSAN GRANDSTAFF,**
**JULENE RICHARDS, and**
**DUSTIN SMITH**

**Defendants.**
______________________________/

## COMPLAINT

Plaintiff, WALTER MICHAELSON ("Plaintiff"), sues Defendants, UBS FINANCIAL SERVICES, UBS BANK USA, ERIC BEADLE, SUSAN GRANDSTAFF, JULENE RICHARDS, and DUSTIN SMITH (collectively, at times "Defendants"), and alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1. This is an action for damages based upon Federal question jurisdiction, as well as for state supplemental claims that are part of the same case or controversy, that is within the jurisdiction of this Court pursuant to 28 U.S.C. §§ 1331 and 1367.

2. At all times material hereto, Plaintiff is a resident of Naples, Florida, and over the age of 18.

3. Defendant, UBS BANK USA, INC. ("UBS Bank") is a Utah corporation with its principal place of business in Salt Lake City, Utah. It is authorized and did conduct business within the State of Florida as a foreign, for profit, corporation. UBS Bank maintains a registered

agent in Tallahassee, Florida. UBS Bank engages in a wide range of banking services, including, but not limited to, loans services which it offered to Plaintiff through a branch office in Naples, Florida. UBS Bank is a banking institution and falls within the definition of 15 USC § 78c(a)(6).

4. Defendant, UBS FINANCIAL SERVICES, INC. ("UBSF"), is a Delaware corporation with its principal place of business in Weehawken, New Jersey. It is authorized and did conduct business within the State of Florida as a foreign, for profit, corporation. UBSFS maintains a registered agent in Tallahassee, Florida. UBSFS engages in a wide range of finance-based transactions, including, but not limited to, investment advisory services which it offered to Plaintiff through a branch office in Naples, Florida. UBSFS is an investment institution and falls within the definition of 15 USC § 78c(a)(3)-(5).

5. Defendant, Eric Beadle ("Beadle"), is a resident of Florida and is an Investment Adviser Representative registered and licensed in the State of Florida, who, at all relevant times to this Complaint, was employed by UBSFS in its Naples, Florida and/or Bonita Springs, Florida branch(es). Mr. Beadle, at all relevant times to this Complaint, was an investment adviser as defined by of 15 USC § 78c(a)(20).

6. Defendant, Susan Grandstaff ("Grandstaff"), is a resident of Florida and is an Investment Adviser Representative currently registered and licensed in the State of Florida, who, at all relevant times to this Complaint, was employed by UBSF in Naples, Florida. Ms. Grandstaff, at all relevant times to this Complaint, was an investment adviser as defined by of 15 USC § 78c(a)(20).

7. Defendant, Julene Richards ("Richards"), is a resident of Florida and is an

Investment Advisor Representative currently registered and licensed in the State of Florida, who, at all relevant times to this Complaint, was employed by UBSF in its Fort Lauderdale, Florida office. Ms. Richards, at all relevant times to this Complaint, was an investment adviser as defined by of 15 USC § 78c(a)(20).

8. Defendant, Dustin Smith ("Smith"), is a resident for Florida and is an Investment Adviser Representative currently registered and licensed in the State of Florida, who, at all relevant times to this Complaint, was employed by UBSF in its Naples, Florida. Mr. Smith, at all relevant times to this Complaint, was an investment adviser as defined by of 15 USC § 78c(a)(20).

9. Venue is proper in this District as Defendants reside within this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

**FACTS COMMON TO ALL COUNTS**

10. In July of 2003, Plaintiff opened a Resource Management Account ("RMA") at UBSFS in Naples, Florida. Additionally in 2003, Plaintiff opened four separate and distinct accounts at UBSFS in Naples, Florida which included (i) an investment account for Plaintiff's asset protection trust; (ii) an account to service Plaintiff's private foundation, a 501(c)(3); and (iv) a joint account benefiting Plaintiff's dependent mother, a quadriplegic living in Plaintiff's home in Naples.

11. In 2007, Plaintiff procured two home equity loans from UBS Mortgage, L.L.C., which were collateralized by Plaintiff's two properties and both held solely in Plaintiff's own name.

12. In 2004, UBSF adopted a policy whereby certain asset protection trusts could no longer be maintained at any UBSF office in the United States. Therefore in 2004, UBSF closed

Plaintiff's investment account held at UBSF Naples, Florida for the asset protection trust dealing with Plaintiff's holding corporation Walmih, L.L.C. ("Walmih").

13. Not wanting to lose Plaintiff's business, UBSF convinced Plaintiff to travel to the London offices of UBSF in 2004 and open a UBSF investment account under the regulatory authorities of the UK for Plaintiff's asset protection trust with Walmih.

14. As part of the agreement to keep Plaintiff's business at UBSF, Plaintiff's long-time advisor in the UBSF Naples office was allowed to participate in the management of the UBSF London investment account for Plaintiff's asset protection trust.

15. Since the UK-regulated accounts at UBSF London was a non-dollar based account and since Plaintiff's UBSF U.S. investment account for Walmih in Naples, Florida was closed, Plaintiff's long-term advisor at the UBSF Naples office acted as agent *between* 2004-2007 for any dollar-based transactions Plaintiff's asset protection trust required in the U.S.

16. Between 2004 and 2007, Plaintiff spoke with his UBSF London investment advisors regularly regarding the Walmih account. On occasion, Plaintiff even had several face-to-face in person meetings with his U.K. UBSF advisors.

17. Dissatisfied with his arrangement at UBSF Naples, Florida, Plaintiff's long-time investment advisor accepted employment with Merrill Lynch in Naples, Florida in mid-2007, taking all of Plaintiff's UBSF accounts from both UBSF Naples and UBSF London with him to Merrill Lynch.

18. By the end of the fourth quarter 2007, all but two of Plaintiff's accounts at UBSF were completely closed with a zero balance. In particular, Plaintiff's primary RMA account held in the Naples, Florida office of UBSF and the UBSF London investment account for Walmi were completely closed with a zero balance. Both aforementioned accounts were transferred over to Merrill Lynch in 2007 with the unequivocal directive from Plaintiff to render Plaintiff's UBSF

accounts permanently closed. From that time forward, Merrill Lynch acted as the only financial entity authorized to transact business with those above referenced accounts.

19. As of the end of 2007, UBSF had no further authority to do anything in the name of those two specific accounts. Furthermore, Plaintiff requested that UBSF confirm to Plaintiff that UBSF not only close these two accounts but rendered them null and void at UBSF. UBSF Naples confirmed that to Plaintiff at the end of December 2007 when the last of the illiquid securities held at UBSF (i.e., FICO strips) were finally transferred over to Merrill.

20. Moreover, Plaintiff's UBSF Naples, Florida account for the now-dissolved 501(c)(3) had a remaining balance of $237.16 and Plaintiff's joint account with his mother reflected a $3.15 balance. Both of these accounts were also closed at UBSF, however, they were not expunged from the UBSFS system while these balances remained.

21. In keeping with Plaintiff's desire to entrust his assets only to his long-time investment advisor who was now working for Merrill Lynch, Merrill Lynch paid down both of Plaintiff's 2007 UBS-issued home equity loans. At the same time and at an additional cost to Plaintiff, Merrill then replaced the one home equity loan which was collateralized by Plaintiff's Naples, Florida home.

22. Two years later in 2009, Plaintiff had grown dissatisfied with Merrill Lynch and given that Plaintiff's long-time investment advisor was bound to Merrill by contract, Plaintiff began looking for another financial institution to service his accounts. Plaintiff spoke with Michael Jordan of UBSF, Naples, Florida to inquire about opening a new account.

23. Understanding that Plaintiff wanted to remove his assets from Merrill and desiring to capture Plaintiff's business, Jordan was able to quickly arrange for the immediate transfer of Plaintiff's assets from Merrill to UBSF without requiring Plaintiff to first complete and sign the necessary UBSF paperwork for opening new accounts.

24. UBSF was able to move more expeditiously than could another financial institution because while Plaintiff closed his UBSF accounts in 2007, UBSF did not expunge the account numbers and other identifying information associated with those UBSF closed accounts. Furthermore, Plaintiff did not change the names of the accounts while at Merrill. UBSF Naples took advantage of these two factors to circumvent the legal requirement of needing to first have validly executed account forms in place before moving assets from Merrill to UBSFS.

25. Jordan explained that despite the movement of assets back to UBSF and into closed accounts, UBSF had no current valid agreement with Plaintiff and that Plaintiff would need to visit the Naples UBSF office and complete the required paperwork to complete the opening the new accounts from scratch. Until Plaintiff executed new contracts with UBSF, UBSF could only invest Plaintiff's money in overnight money market funds which earned the lowest rate of interest.

26. Jordan never called Plaintiff to arrange for Plaintiff to sign the required documentation. Plaintiff never arranged a time to go into UBSF Naples to sign the documentation. In the meantime, Plaintiff explored options with other financial institutions operating in Naples, Florida.

27. Some weeks later, Plaintiff received a call from Dustin Smith, Jordan's associate in the Naples office. Mr. Smith was soliciting business for UBSF. Smith expressed concern that Plaintiff's assets at UBSF were earning next to nothing in money-market funds. Moreover, Smith argued that the money-market rate that Plaintiff was earning at UBSF was not even enough to offset the payments to Merrill for Plaintiff's home equity loan. Smith proposed a more aggressive investment strategy at UBSF and Smith proposed replacing Merrill's home equity loan with one offered by UBSF having more favorable terms.

28. Plaintiff had never spoken to Smith before, nor had expressed any interest to Jordan or anyone else at UBSF in replacing the Merrill home equity loan.

29. Smith was not concerned that Jordan neglected to have Plaintiff execute valid account documents with UBSF or that Plaintiff's portfolios were being housed in a closed accounts.

30. Not dissuaded from being repeatedly rebuffed by Plaintiff, Smith persisted. In his many calls to Plaintiff over a six-week period, Smith worked to prove himself as the trusted advisor capable of replacing Plaintiff's long-time advisor at Merrill.

31. In those unsolicited phone calls, Smith repeatedly pushed for replacing the Merrill home mortgage loan with a UBS Bank loan. Smith argued that Plaintiff was not only throwing money away with Merrill's higher interest rate, but Plaintiff was unnecessarily "tying up" assets (i.e., his Naples home) as collateral with Merrill's loan. Through UBS Bank, Smith could arrange for a rate which was more than 50 percent lower than Merrill's interest rate and could do so without requiring Plaintiff to post any collateral or restrict any of Plaintiff's UBSFS accounts.

32. According to Smith, UBS Bank would approve Plaintiff's requested loan amount of $978,932 based on Plaintiff's ability to repay the loan given Plaintiff's yearly income.

33. Smith failed to tell Plaintiff that he was not proposing to replace Merrill's home mortgage loan with one similar to what UBSF provided to Plaintiff in 2007 through UBS Mortgage, L.L.C. Rather, UBS Bank would provide the funds through a credit facility reserved for UBS Bank business clients to fund their specific business and corporate needs. Plaintiff was a private individual not a business entity. Moreover, Plaintiff would be refinancing his personal home equity loan on his house in Naples and not using the UBS credit line for business/corporate needs.

34. Smith failed to inform Plaintiff of the business nature of the loan from UBS Bank. Smith manipulated the UBS Bank procedure to circumvent financial regulations wherein UBS Bank cannot loan money to Plaintiff to use in total and immediately in UBSF investments. Smith purposefully took advantage of the fact that Plaintiff's UBSF accounts were in a closed/ non-renewed status. Smith manipulated the account forms at UBSF as he needed and began to use Plaintiff's accounts to his to receive large commissions and generate much needed business for the Naples UBSF branch office. Plaintiff's had no indication of Smith's action, as Plaintiff knew that his accounts were closed in 2007 and therefore could not be part of the regulated active UBSF accounts until new account papers were signed.

35. Smith falsely informed Plaintiff that the transfer of assets from UBS Bank fungible money to use and invest as he pleased. Smith, however, failed to inform Plaintiff that money had restrictions and could not be used as freely as it was held out to be. In fact, based on the work completed by Smith to obtain the funds from UBS Bank, Smith actually had Plaintiff pledging and encumbering all of his assets held in all of his UBSF accounts against this alleged "free money."

36. What Plaintiff did not know was that UBSF reserved the right to freeze all of Plaintiff's funds to protect the UBS Bank loan from which the funds were originating. Moreover, if Plaintiff refused to invest in UBSF products with the UBS Bank monies, Smith or his superiors would threaten to freeze Plaintiff's accounts and call the entire UBS Bank loan due.

37. In July, 2009, Smith proposed to meet Plaintiff at Starbucks near Plaintiff's home. Smith impressed upon Plaintiff that it was important to meet not just because of the UBS loan, but because Plaintiff finally needed to execute the UBSF new account agreements.

38. At the July 2009 meeting at Starbucks, Smith brought the UBS Bank loan application but did not bring the required UBSF new account forms for Plaintiff's RMA and for Walmih account.

39. The UBS Bank application that Plaintiff reviewed was roughly 10 pages in length. Under the entry for client, the UBS Bank application had Plaintiff's first and last name typed in, exactly as it appeared on both the previous 2007 UBS Mortgage, L.L.C. documentation and the 2008 Merrill equity loan documents. There was no reference in the UBS Bank loan application to Plaintiff's home in Naples, Florida. Further, there was no mention of Plaintiff's asset protection trust. The UBS Bank application just made reference to Plaintiff's old UBSF RMA account number.

40. The UBS Bank application which Smith presented to Plaintiff at Starbucks asked for the his yearly income. Plaintiff provided his yearly income information based primarily on Plaintiff's yearly disability income. Smith then entered that information on the application in Plaintiff's presence.

41. Prior to signing, Plaintiff reviewed the UBS Bank loan application to ensure that there were no errors regarding Plaintiff's personal information and to ensure that there was no reference to the Walmih account. As he did on the previous 2007 UBS Mortgage, L.L.C. loan and the 2008 Merrill equity loan, Plaintiff signed the UBS Bank application in his name only and not in any other capacity.

42. Shortly thereafter, Smith phoned Plaintiff to inform him that UBS Bank had approved the credit facility for $978,932 to pay down the loan amount calculated by Merrill equity loan. UBS Bank sent the $978,932 payment directly to Merrill for Plaintiff's benefit.

43. Neither UBSF nor UBS Bank sent a copy of the completed loan agreement to Plaintiff. Plaintiff believes that their failure to do so was intentional. Had either UBSF or UBS

Bank sent a copy of the loan agreement to Plaintiff, Plaintiff would have seen that Smith altered Plaintiff's name on the UBS loan to make it appear that it was not the Plaintiff himself individually but rather Plaintiff holding company Walmih, L.L.C.

44. Smith surreptitiously converted Plaintiff's name and information entered on the July 2009 UBS Bank application from an individual person to a fictitious business because the UBS Bank loan Smith was utilizing to pay down Plaintiff's personal home equity loan was restricted to businesses only. Smith's altering of the documents and accounts could not have gone undetected by any regulator or by UBSF's own compliance safeguards because neither the fictitious business applying for UBS loan nor the UBSF RMA account associated with the fictitious business had ever validly executed any UBSF account agreements.

45. Plaintiff was led to believe that the UBS Bank loan taken to replace the Merrill equity loan was an unsecured line of credit, whereas the Merrill equity loan was secured by Plaintiff's home. However, when Smith added Walmih, L.L.C. to the UBS Bank loan, all of Plaintiff's accounts were now tied to the UBS Bank loan and used as a collateral security. In effect, instead of the UBS loan only tying up equity in Plaintiff's home, like the Merrill loan, it actually tied up all of Plaintiff's liquid assets wherein the actual collateral security was now five times greater than the value of Plaintiff's home.

46. With approximately $1 million of the UBS loan successfully executed, Smith then called Plaintiff and informed him that Smith voluntarily had Plaintiff's original July, 2009 UBS Bank loan amount increased from was $978,932 to $4,978,932. Plaintiff neither asked for the UBS Bank loan to be increased nor had he provided any indication to Smith that he wanted any additional financing needs beyond the simple refinancing of Plaintiff's personal home equity loan with Merrill. Despite the very low interest rate of 1.84 percent and despite the very attractive UBS loan condition claiming that none of Plaintiff's assets at UBS would be "tied up,"

Plaintiff refused to do anything with the additional $4 million. Regardless, Smith continued with the pitch that UBS Bank was providing Plaintiff with "free money" and if Plaintiff had no current need for the "free money," the additional $4 million of the UBS credit line was available, should Plaintiff require it at a later time.

47. Smith began to encourage Plaintiff to more aggressively invest the UBS Bank loan funds to maximize the carry over between the cost of the UBS Bank loan and the return on its investment.

48. Once again, Plaintiff strongly impressed upon Smith that Plaintiff's investments were to be strictly targeted for capital preservation. Plaintiff made it clear to Smith that Plaintiff would gladly sacrifice return for the safety of capital preservation. Plaintiff underscored that all investments must be in highly liquid instruments, having readily available markets for efficient liquidation.

49. Plaintiff also made clear that Plaintiff wanted his portfolio to be on auto-pilot. Plaintiff explained to Smith that he had serious health issues and needed the portfolio to be structured as directed here because Plaintiff was unable to monitor his investments. Smith was to contact Plaintiff only when absolutely necessary.

50. Smith knew that Plaintiff had suffered a debilitating injury in a car accident in 1996 and that he was under the care of a team of pain and rehabilitation specialists who warned Plaintiff to avoid any and all types of emotional stress. Smith was aware that Plaintiff was undergoing risky surgery to block the pain radiating from the fracture in his neck and into his head.

51. Therefore, despite Plaintiff's previous financial background, Plaintiff has had his investment portfolio always under management since the 1996 accident and until early in 2009 under management with only one trusted investment advisor.

52. Smith reassured Plaintiff that he understood the parameters Plaintiff was setting for the portfolio and that Smith would fully abide by them. However, Smith had no intention of abiding by Plaintiff's strict parameters. Plaintiff was specifically targeted as the victim of a wider scheme.

53. Plaintiff avers that Smith's true intention here was to convince Plaintiff to invest the UBS funds in UBS's proprietary investment products. Not only would Smith be rewarded handsomely through commissions from both UBS Bank and from UBSF, but Smith would also provide UBSF with a profitable opportunity to sell its own UBSF products in a saturated and contracting market. UBSF would also make money on the sale of its own products and then that money would go to pay UBSF's expenses for which there was no risk to UBSF or UBS Bank since Smith doctored the UBS Bank loan agreement to tie up all of Plaintiff's assets at UBSF as collateral. In addition, the UBSF Naples office generated business from these transactions which assisted in their survival as a satellite office after the cost-cutting procedures were instituted as a result of the 2008 financial crash.

54. To allay any concerns Plaintiff may have had and to gain Plaintiff's trust, Smith, for the balance of 2009, complied with Plaintiff's directives to have his UBSF portfolios completely invested in short-term, liquid, high quality, capital preservation-aimed fixed income instruments.

55. The period from August 2009 to December 2009 also provided Smith with the opportunity to assess how uninvolved Plaintiff would be with his UBSF portfolios. During those four months, Plaintiff communicated with Smith regarding the portfolio only a couple of times. Smith understood from Plaintiff that Plaintiff was sending the UBSF account statements directly to his accountant unopened. Smith further noted that Plaintiff did not take advantage of UBSF's online account access. Plaintiff's UBSF portfolio was truly on auto-pilot.

56. Then finally in the December 2010, Smith called Plaintiff at his home on several occasions, hoping to pitch the idea of Plaintiff's investing the UBS Bank funds in one of UBS's own proprietary products. Plaintiff did not speak to Smith in December, 2009, but did agree by email to arrange a time to speak to Smith in early January after the holidays.

57. During a phone call in early January 2010, Smith claimed that he was having trouble efficiently investing the approximate total of $1 million of UBS loan proceeds at a return that could offset even the very low UBS interest expense on the loan. Smith knew that this was not true, but knowingly made this false statement with the intent to lure Plaintiff into investing the UBS Bank funds in UBSF's own proprietary products.

58. Smith approached Plaintiff with a "pretty interesting" investment for the portfolio regarding the product called *the UBS AG Performance Security Linked to the UBS V10 Currency Index With Volatility Cap* ("V10" or "UBS V10"). Plaintiff had never heard of the V10 and had no familiarity the instrument, its components, and how it functioned.

59. Anticipating Plaintiff's arguments against the UBS V10, Smith told Plaintiff that the UBS V10 guaranteed capital preservation and that Smith specifically selected that UBS V10 because the UBS V10's profitability was based on Euro currency volatility. Plaintiff avers that both of these arguments were false and further that Smith knew they were false when he made them.

60. Smith offered this false claim about profits driven by Euro currency volatility because Smith knew that Plaintiff strongly believed that there would be a Euro currency crisis and that any investment linked to increased Euro currency volatility would be profitable.

61. Smith capitalized on this information and told Plaintiff that he was convinced, with overwhelming certainty—that an investment in the UBS V10 would yield Plaintiff at least 7 percent annually, and realistically yield 15 percent annually and would do so with

complete capital preservation. Smith noted that an investment in the UBS V10 with that level of expected return would provide a comfortable yield cushion to offset the 1.84 percent UBS interest expense for the UBS loan, while providing the portfolio with a handsome return: $50,000 to $130,000 of pure net profit/year per $1 million of invested in the UBS V10.

62. Smith told Plaintiff that if Plaintiff did not move quickly Plaintiff would miss this investment opportunity in the UBS V10. Further, Smith informed Plaintiff that he did not know when there would be an investment opportunity like this in the UBS V10 again.

63. Plaintiff was hesitant about the UBS V10 product and requested that Smith send him all of the relevant material research on the UBS V10. Plaintiff also asked Smith to send Plaintiff the official UBSF prospectus for the UBS V10 offering.

64. Smith told Plaintiff that he could rely on Smith's extensive knowledge of and experience with the UBS V10 for all of the exact, detailed, material information for the UBS V10.

65. Despite, the back and forth regarding the V10, Smith told Plaintiff that if Plaintiff would not permit Smith to invest in the UBS V10 and if Smith could not find another suitable high-yielding investment which could sufficiently cover the UBS loan's interest expense, Smith may need to return the $1 million of UBS proceeds. Smith further warned Plaintiff that if Smith were forced to repay the almost $1 million UBS loan, that meant that Plaintiff risked losing the entire $5 million of UBS credit facility for non-use.

66. Relying on the information Smith provided on the UBS V10 and on the UBS loan, and further on the trust Plaintiff had come to have in Smith, Plaintiff permitted Smith to purchase 100,000 shares of the UBSF V10 at the issue price of $10/share on January 26, 2010. This represented a $1 million investment of the UBSF V10: an amount equaling the 2009 UBS credit loan drawdown of $978,932, rounded up by $21,068 as required for permissible

increments in the UBS V10.

67. Plaintiff continued in his normal routine with confidence in Smith and his investment in the UBS V10. Just as Plaintiff had requested or hoped, his UBSF accounts would remain on auto-pilot invested in short-term, liquid, high quality, capital preservation-aimed fixed income instruments.

68. Then, in May of 2010, Smith contacted Plaintiff and informed him that Plaintiff was at risk of losing the approximately $4 million outstanding UBS credit line because of non-use. Smith also intimated that if the $4 million of the credit line were revoked it may put the existing $978,932 UBS Bank loan at risk, at least as far as the favorable loan terms.

69. Smith proposed an investment strategy to prevent UBS from revoking the $4 million remaining in UBS loan. Smith recommended investing the $4 million of the UBS loan in safe, short-term, liquid exchange-traded funds (ETF's) in accordance with the parameters set by Plaintiff.

70. Again, Smith argued that at a 1.84% interest rate on the $4 million the UBS loan was the equivalent of UBS giving Plaintiff "free money" for Smith to invest. Smith further stressed that he had a duty to take advantage of this and to maximize the profit of Plaintiff's portfolio under the parameters.

71. Plaintiff then gave Smith the authority to execute an additional estimated $4 million of the UBS credit line and to invest the appropriate exchange-traded funds (ETFs).

72. In the midst of executing the $4 million with UBS Bank, Smith called Plaintiff and reported that because of the way UBS Bank structured the credit line the UBS Bank loan funds could not be initially transferred to an internal UBSF account. Plaintiff would need to provide an investment account at another financial institution, for example at Merrill (as with the home mortgage loan) and then later move the money to UBSF.

73. Noting that Plaintiff was alarmed, Smith reassured Plaintiff that Smith and other investment advisors at UBSF Naples had executed many of these types of UBS Bank loans for their UBSF clients in this exact fashion without any problems and that this procedure had the approval of management at all levels of UBSF and UBS Bank. After all, Smith argued, this was UBS's money and UBS would do nothing to put its own funds in jeopardy.

74. At Smith's urging, Plaintiff provided Smith with Plaintiff's account numbers at Merrill Lynch where Plaintiff's trusted long-term advisor still worked. Smith directed UBS Bank to transfer the $4 million of UBS Bank funds to Plaintiff's account at Merrill Lynch. Once the funds cleared at Plaintiff's account at Merrill, Smith coordinated with Plaintiff's long-time investment advisor about the agreed investment strategy using safe, liquid ETF's.

75. Over the next few months, Smith would contact Plaintiff and report that UBS V10 continued to enjoy a 7 percent gain and he pushed for more investment in the UBSF V10. Smith told Plaintiff that the original $1 million investment in the UBSF V10 had a $70,000 profit and that he wanted Plaintiff to divert $1 million of the recently drawn $4 million UBS loan from Merrill back to UBSF with the proceeds invested into the UBSF V10. It was Smith's plan to eventually have all of the $4 million transferred back from Merrill and invested in UBSF's own proprietary products.

76. In early July of 2010, Smith again called Plaintiff to pressure Plaintiff to invest another $1 million dollars in the UBS V10. Plaintiff was growing tired of all of the calls from Smith regarding requests for additional investments in the UBS V10.

77. Plaintiff informed Smith that Plaintiff wanted his portfolio back on auto-pilot and that he only wanted calls from Smith when necessary. Plaintiff then informed Smith that Plaintiff had no further interest in the UBS V10. Satisfied with the reported $70,000 profit in the $1 million UBS V10 investment, Plaintiff instructed Smith to liquidate the portfolio's original

investment of $1 million in the UBSF V10 and to capture the reported $70,000 profit. Plaintiff further instructed Smith to make investments within the parameters previously outlined and to stop the continued phone calls and solicitations.

78. Plaintiff's order to sell the UBSF V10 was based on Smith's information that USB V10 was actively trading at $10.70/share. This would operate as a $70,000.00 net gain for Plaintiff.

79. Smith attempted to dissuade Plaintiff from selling the UBS V10. However, when Smith realized Plaintiff was not going to be dissuaded, Smith informed Plaintiff that the UBS V10 was not trading at $10.70/share price as he had previously reported.

80. In fact, the UBS V10 was trading at a price of $8.73/share. This would operate as a significant loss to Plaintiff of $127,000.00. Upon receiving such information showing such a drastic change in circumstances, Plaintiff became alarmed.

81. Plaintiff demanded information from Smith regarding the UBS V10. Specifically, Plaintiff requested: the UBSF's official prospectus on the UBS V10 which Plaintiff had previously requested and never received; the full current algorithm (reflecting the current pricing of the UBS V10); all current research on the UBS V10; and the UBS market prices for the UBS V10 (high, lows, and closes) for the period between January 26, 2010 and July 8, 2010.

82. Smith verbally agreed that he would send to Plaintiff's home the material that Plaintiff requested and informed Plaintiff he would have to contact the UBS NY trading desk to access the algorithm.

83. Smith further informed Plaintiff that Smith could not sell Plaintiff's shares in the UBS V10 and that Plaintiff would have to do it through Smith's supervisors.

84. Plaintiff then contacted Smith's immediate supervisor, Susan Grandstaff.

Grandstaff was aware of the $5million UBS loan and that $1 million of that loan was invested in UBSF's own proprietary product, the UBS V10. Grandstaff was also aware that $4 million of the UBS Bank loan was invested in ETF's at Merrill. Grandstaff showed no concern that the UBS funds were targeted for UBSF's own products, but was annoyed that Merrill had UBS Bank's funds for Merrill investments.

85. Despite numerous communications back and forth, Grandstaff did not provide Plaintiff with any further information regarding the UBS V10.

86. Approximately one month later, Plaintiff was able to get a confirmation from Grandstaff through Julene Richards in the UBSF Ft. Lauderdale Office that Plaintiff could sell his shares in the UBS V10. Regardless, Plaintiff still received no further information regarding the UBS V10 despite his repeated inquires.

87. During the prolonged wait from July 8, 2010 to August 2, 2010, no one at UBSF was managing Plaintiff's portfolio and the UBS V10 continued to lose Plaintiff's money while he continued to pay UBS the interest charges on the UBS loan that was original used to fund the purchase of the UBS V10.

88. On August 2, 2010, Grandstaff informed Plaintiff that he would need to sell the 100,000 shares of the UBS V10 only through the UBS Naples office and at a price at which the New York UBS trading desk felt comfortable buying back the UBS V10. Furthermore, Plaintiff would only be permitted to sell the UBS proprietary product back to UBS under strict procedures that Grandstaff would set for Plaintiff. Grandstaff then warned Plaintiff if he did not satisfy every condition explicitly as Grandstaff demanded, her UBSF Naples office would refuse to provide a price to Plaintiff, thus denying Plaintiff the ability to sell the UBS V10 to the UBS NY trading desk.

89. The procedures which Grandstaff imposed on Plaintiff for liquidating the UBS

V10 were shockingly onerous and made no functional sense as they did not conform to regular market convention practices.

90. Under the set of procedures that Grandstaff imposed on Plaintiff to liquidate the UBS V10, Plaintiff was to call a UBSF Naples salesperson, Eric Beadle, who Grandstaff appointed to carry out her onerous procedures. Plaintiff was required to speak to Beadle directly between the time Beadle arrived in the office (i.e. which should be around 9:00 a.m., Plaintiff was told ) and no later than the 10:00 a.m. deadline set for Plaintiff to ask for a daily UBS V10 price. If Plaintiff was unsuccessful in speaking with Beadle on the phone between 9:00 a.m. and 10:00 a.m., Plaintiff was denied any access to a UBS price for the UBS V10 for that day.

91. Plaintiff was denied the ability to place an outstanding order and was only permitted to place day orders to Beadle by phone day-to-day and within the sixty minute timeframe specified. Furthermore, Plaintiff was not allowed to remain on the phone with Beadle and wait for UBS's price for the UBS V10. Instead, Beadle would terminate the phone conversation with Plaintiff and Plaintiff was then required to sit and wait patiently until Beadle called Plaintiff back to inform Plaintiff of the price at which UBS was willing to buy back the 100,000 shares of UBS V10 for that day.

92. Furthermore, there was no time limit set for Beadle to get back to Plaintiff with UBS's price for the 100,000 shares of UBS V10. In fact, if Beadle never called Plaintiff back that day with a price (which often occurred, and at times four days in a row), Plaintiff would be denied the ability to transact and Plaintiff would need to try again on another day. Plaintiff was further denied permission to call the NY UBS trading desk directly for a price on the UBS V10.

93. In addition to the shockingly onerous procedures, Grandstaff demanded that Plaintiff repay the full amount of UBS Bank's $5 million dollar loan by August 9, 2010. Grandstaff further warned that if UBS did not receive full repayment of UBS Bank loan by the

close of business on August 9, 2010, UBSF would forcefully liquidate Plaintiff's shares in the USB V10 at whatever price the UBS NY trading desk felt comfortable in setting at the time of Grandstaff's forced liquidation.

94. When Plaintiff asked Grandstaff why UBS Bank would be recalling the $5 million dollar credit line, Grandstaff informed Plaintiff that neither she nor UBS Bank needed to have a reason to demand immediate repayment. A simple request by Grandstaff to the UBS Bank would suffice for UBS Bank to pull the entire credit line.

95. While Plaintiff waited nearly 30 days for Grandstaff to set the shockingly onerous conditions for Plaintiff to sell back the UBS V10, no one at UBSF was assigned to manage Plaintiff's portfolios. Furthermore all of Plaintiff's accounts held at UBSF were frozen pending resolution of the dispute regarding the UBS V10. This meant that all regular payments, checks, credit cards, debit cards, ATM access were completely restricted for a period which turned out to take several months.

96. When Plaintiff complained to Grandstaff and to Richards that all of Plaintiff's accounts at UBSF were frozen, UBSF produced the doctored July 2009 UBS Bank loan agreement. Both Grandstaff and Richards were unconcerned that the client named in the UBS loan was a fictitious LLC that Smith created to have it appear that a business and not an individual applied for that UBS Bank loan. Furthermore, Grandstaff and Richards were unconcerned that while the UBSF investment account for Walmih was later entered on the UBS Bank application, there was no authorizing signature for the asset protection trust separate and distinct from Plaintiff's signature for his own personal UBSF RMA. From that point on, Plaintiff avers that Grandstaff froze all of his funds and denied him access to his money at UBSF until November 2010.

97. It took the intervention by Richards in early August to get Grandstaff to finally

reinstitute the aforementioned shockingly onerous conditions so that Plaintiff could regain access to his portfolio for the limited purpose of liquidating the portfolio to repay the approximate $5 million UBS Bank loan. While forcing Grandstaff to finally act, Richards, nonetheless, completely supported Grandstaff and ignored all repeated complaints by Plaintiff regarding the onerous conditions Grandstaff set for liquidation.

98. Around this time, Plaintiff received a letter from Scott Blamires of UBS Bank making a formal demand for full repayment of the UBS loan plus interest. As a result of the demand being made by UBS, Plaintiff was forced to liquidate his portfolio holdings of ETFs. Plaintiff sustained significant losses in the liquidation process which Plaintiff would not have been sustained but for Grandstaff's retaliatory measures. Furthermore, Plaintiff was required to pay transactional fees and commissions to UBSF for the liquidation of his portfolio to in order to pay off the UBS credit line demand. Some of those fees were shown to be inflated and not what was originally reported in the UBSF confirmations at the time of transaction.

99. Plaintiff was unable to sell the UBS V10 by the August 9, 2010 loan repayment deadline. Therefore, Plaintiff was forced to use other sources of funding to pay back the UBS loan proceeds that Smith used for the purchase of the UBS V10 shares. By August 9, 2010, UBS had all of its $5 million dollar loan repaid, and Plaintiff was still stuck holding his shares in the UBS V10.

100. On November 2, 2010, Plaintiff was finally able to sell the 100,000 shares of the UBS V10 back to UBS at a substantial loss. However, UBSF did not release Plaintiff's cash to him until November 10, 2010.

101. The entire process has taken a great deal of unnecessary emotional and financial stress on Plaintiff and Plaintiff's accounts.

**FIRST CAUSE OF ACTION**
**(Violation of Section 10 and Rule 10b-5 of the Exchange Act – All Defendants)**

102. Plaintiff repeats and realleges each and every allegation set forth in Paragraphs "1" through "101" above, with the same force and effect as if set forth fully herein.

103. This is an action pursuant to 15 U.S.C. § 78j and the rules and regulations promulgated thereunder.

104. 15 U.S.C. § 78j(b), Manipulative and Deceptive Devices, states, in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interest commerce or of the mails, or of any facility of any national securities exchange – (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm- Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

105. Defendants were sellers of securities for the purposes of the Exchange Act.

106. Defendants solicited Plaintiff's investment by way of misrepresentations about the nature of the UBS V10 in both the initial conversations with Plaintiff and thereafter by way of the erroneous information regarding the per share price of the UBS V10 when Plaintiff sought to sell.

107. Defendants were motivated to induce Plaintiff to purchase shares in the UBS V10 by their desire to serve their own financial interests.

108. Defendants knew the representations were false and that information provided to Plaintiff was inaccurate and design to mislead.

109. More specifically, UBSF and Smith, knew or should have known and correctly informed Plaintiff that:

i. there was no capital preservation protection mechanism in the UBS V10

for Plaintiff which would keep him at $10 per share in the worst of scenarios;

ii. the Euro currency was never included in the UBS V10;

iii. the US dollar was included in the UBS V10;

iv. the UBS V10 was actually trading well below $10.70 per share, despite what Plaintiff was continually being informed of;

v. Plaintiff was losing his investment monies;

vi. The UBS V10 was aimed at capital appreciation and not preservation

110. Despite having the knowledge of the aforementioned items, UBSF and Smith still purposefully informed Plaintiff to contrary in order to entice him to invest and continue investing in the UBS V10.

111. Furthermore, UBS purposefully loaned, via credit line, Plaintiff five (5) million dollars with the knowledge and intent that Plaintiff would not only be paying UBS interest and associated fees on the credit line, but also that UBS would be receiving benefits from UBSF's investment vehicles including but not limited to all associated costs, fees, interest, capital purchasing power and zero risk as all transactions were made against Plaintiff.

112. Moreover, UBS willfully and intentionally through the assistance of Grandstaff, Richards and Beadle, purposefully manipulated Plaintiff's continued investment in the UBSF 10 despite the fact that Plaintiff had made numerous requests to sell. The aforementioned Defendants purposefully blocked Plaintiff from selling the UBSF 10 shares while continuing to profit from the predicament in which they placed Plaintiff.

113. Defendants directly used several instrumentalities of commerce, mail, and national securities exchange to perpetrate the aforementioned manipulative and deceptive devices and contrivances upon Plaintiff for their own profit.

114. Based upon the actions as described herein, Plaintiff has suffered monetary damages in excess of three hundred fifty thousand dollars ($350,000.00).

**SECOND CAUSE OF ACTION**
**(Violation of 15 U.S.C. § 78o-4(c) – All Defendants excluding UBS Bank)**

115. Plaintiff repeats and realleges each and every allegation set forth in Paragraphs "1" through "101" above, with the same force and effect as if set forth fully herein.

116. Despite numerous requests by Plaintiff, Defendants failed to deliver an Official Statement (Prospectus) or any other pertinent information to Plaintiff prior to or after effecting the share transaction for the UBS V10.

117. 15 U.S.C. § 78o-4(c)(l) states, in pertinent part:

> (1) No broker, dealer, or municipal securities dealer shall make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any municipal security in contravention of any rule of the Board.

118. Based upon Defendants' failure to provide Plaintiff with the Official Statement or Prospectus regarding the UBSF V10, Plaintiff was unable to properly evaluate the investment, including the risk involved.

119. Based upon the aforesaid conduct, Plaintiff has suffered monetary damages in excess of three hundred fifty thousand dollars ($350,000.00).

**THIRD CAUSE OF ACTION**
**(Violation of § 20(a) of the Exchange Act – USBF, Grandstaff)**

120. Plaintiff repeats and realleges each and every allegation set forth in Paragraphs "1" through "101" above, with the same force and effect as if set forth fully herein.

121. 15 U.S.C. § 78t(a) addresses control person liability and states as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts

constituting the violation or cause of action.

122. At all times material hereto, USBFS and Grandstaff employed Smith and were in direct control of Smith with respect to his dealings with Plaintiff. As the employer of Smith, UBSFS and Grandstaff had both knowledge and reasonable grounds to believe that they controlled Smith and were, or should have been, well aware of Smith's actions and omissions.

123. Grandstaff is an officer, director, agent and/or shareholder of UBSF who controlled Smith's actions with respect to the claims asserted herein.

124. Accordingly, UBSFS and Grandstaff are control persons of Smith within the meaning of 15 U.S.C. § 78t(a) and are therefore liable, jointly and severally, for violations of said subsection of the Exchange Act.

**FOURTH CAUSE OF ACTION**
**(Negligence – UBS Bank, UBSF and Smith)**

125. Plaintiff repeats and realleges each and every allegation set forth in Paragraphs "1" through "101" above, with the same force and effect as if set forth fully herein.

126. Once Plaintiff opened his accounts with Defendants, a duty arose on the part of Defendants to effect any and all transactions in Plaintiff's account in a way which would inure to Plaintiff's benefit and which would be in his best interests.

127. UBS Bank, UBSFS and Smith negligently breached their duty to Plaintiff by improperly purchasing and selling an investment which was not consistent with Plaintiff's investment objectives, by failing to disclose to Plaintiff the true nature of the investment, by recommending and purchasing an unsuitable investment and by failing to protect the portfolio from dramatic losses.

128. As a direct and proximate result of Defendants' negligent conduct, Plaintiff has suffered monetary damages in excess of three hundred fifty thousand dollars ($350,000.00).

**FIFTH CAUSE OF ACTION**
**(Breach of Fiduciary Duty – All Defendants)**

129. Plaintiff repeats and realleges each and every allegation set forth in Paragraphs "1" through "101" above, with the same force and effect as if set forth fully herein.

130. Defendants, as a financial advisors and account executives, held themselves out to Plaintiff in a manner in which Plaintiff could place his trust and confidence, and whom Plaintiff could rely upon to recommend, offer, buy and manage securities and adequately supervise these activities, and who would deal honestly, openly, fairly and in good faith and in his best interests.

131. Plaintiff placed his trust and confidence in Defendants and then entrusted his assets, his credit, and his good name.

132. Defendants breached their fiduciary duties to Plaintiff, by improperly recommending an investment in securities which were not consistent with Plaintiff's investment objectives, by failing to disclose to Plaintiff the nature of the investment, by recommending and purchasing an unsuitable investment and by failing to protect the portfolio from dramatic losses.

133. As a direct and proximate result of the foregoing, Plaintiff suffered monetary damages in excess of three hundred fifty thousand dollars ($350,000.00).

**SIXTH CAUSE OF ACTION**
**(Common Law Fraud – All Defendants)**

134. Plaintiff repeats and realleges each and every allegation set forth in Paragraphs "1" through "101" above, with the same force and effect as if set forth fully herein.

135. Between January 2009 and November 2010, Defendants made numerous portfolio recommendations, proposals, and directives to Plaintiff and executed such transactions on Plaintiff's behalf.

136. During that time period, Defendants contacted Plaintiff at his home in Naples, Florida and gave Plaintiff information about investments for the portfolio Plaintiff placed under Defendants' care, control and management.

137. In connection with the investment recommendations and proposals, UBSF, Smith, Grandstaff, Richards and Beadle represented to Plaintiff that:

i. the UBS V10 contained European currencies, including the Euro currency,

ii. the UBS V10 was a safe, liquid instrument with tight bid/ask spreads,

iii. UBS stood prepared to make tight two-sided markets in the V10 both by the UBS NY trading desk and UBS London trading desk (giving UBS clients continuous market-making access throughout the two major financial trading time zones),

iv. the UBSF V10 was listed on the London Stock Exchange where it traded with liquidity, giving investors another liquid market in which to sell their UBSF V10 investment when they needed to,

v. the UBSF V10 was similar to the liquid and transparent ETF (exchange-traded-funds) instruments now being employed successfully by UBSFS in Plaintiff's current portfolio,

vi. most of the major investment houses and banks stood ready to make prices in the UBS V10,

vii. the UBS V10 has actively traded for the last 15 years and is a well-established safe, investment product in the market,

viii. there was extensive 15-year historical market data for the UBS V10,

ix. if Plaintiff invested in the UBS V10 he would not find himself in the

position similar to that arising from the auction-rate securities problems where the liquidity dried up, forcing investors to sell at a considerable loss in order to liquidate the position,

x. the UBS V10 offered complete capital preservation with the issue price of $10/share being the floor,

xi. Plaintiff could not lose any of the capital he invested if he purchased the UBS V10 on January 26, 2010 at the issue price of $10/share,

xii. in the worst case scenario the UBS V10 would yield a zero return (that is, "you might make no money but never lose the money you invested"),

xiii. the UBS V10 was the perfect instrument for investors who wanted capital preservation but desired some way to take advantage of Euro currency volatility,

xiv. the Euro currency's volatility was not only one of the European-based currency in the current UBS V10 basket, but whose volatility was key to generating the 7-15 percent return expected for the UBS V10 in 2010,

xv. Plaintiff was at risk of losing the UBS Bank loan for non-use,

xvi. UBS was having difficulty covering the UBS Bank loan interest expense profitably,

xvii. the UBS V10 with its expected 7 to 15 percent annual return could safely and profitably cover the UBS Bank loan interest expense,

xviii. the UBS V10 was trading at a level offering $70,000 profit on July 8, 2010; the day Plaintiff instructed UBSF to sell the UBS V10,

xix. Plaintiff had to follow UBSF's onerous procedures to liquidate the UBS V10 through UBSFS,

138. The aforementioned representations Defendants made were material to the nature and quality of investments (and other services) they provided to Plaintiff.

139. The aforementioned representations made by Defendants were false and misleading.

140. Plaintiff reasonably relied upon Defendants' false representations at all stages of the financial transactions from the making of the loan to the final sale of the UBS V10.

141. Defendants acted in collusion to prevent the release of any material information relevant to the UBS V10 as it was allegedly a proprietary product. The continued failure to disclose information, and Defendants further acts of concealment of facts, prevented Plaintiff from discovery the actionable conduct alleged herein until well after the time that Plaintiff assumed control over his investment portfolio.

142. The information the Defendants failed to disclose includes, but is not limited to:

i. the unsuitability of the UBS V10 investment,

ii. the risks associated with the UBS V10,

iii. the inability for Plaintiff to analyze the risks associated with the UBS V10,

iv. the availability of alternative investments with less risk than the UBS V10 that met the portfolio's parameters set by Plaintiff in 2009,

v. the use of UBS Bank loan proceeds for the purchase of the UBS V10 was a conflict of interest and a direct violation of government regulations, and

vi. the significant fees and commissions generated by UBS on the UBS V10 transactions.

143. Defendants' misrepresentations and active concealments of material facts

were intentionally and wantonly committed and in reckless disregard to Plaintiff.

144. As a direct and proximate result of Defendants' misrepresentations and omissions of material fact, Plaintiff was induced to purchase an unsuitable investment, which resulted in significant monetary losses in excess of three hundred fifty thousand dollars ($350,000.00).

**SEVENTH CAUSE OF ACTION**
**(Failure to Supervise against – UBS Bank, UBSF, and Grandstaff)**

145. Plaintiff repeats and realleges each and every allegation set forth in Paragraphs "1" through "101" above, with the same force and effect as if set forth fully herein.

146. Defendants owed Plaintiff the duty of properly and effectively enforcing its rules and regulations and those of the various self regulatory agencies, of which Defendants are members.

147. Defendants breached those duties to Plaintiff by failing to implement an effective program of supervision and control over Smith, such that all transactions in Plaintiffs account would be effectuated with due regard for Plaintiff's interests.

148. Defendants, USBF's and Grandstaff's negligent supervision of Smith in connection with the handling of transactions in Plaintiff's account was willful, wanton and in reckless disregard of its duties to Plaintiff.

149. Furthermore, Defendants knew or should have known they their actions in lending Plaintiff monies for investment in their own investment vehicles violated Regulations U and T of the Code of Federal Regulations.

150. As a direct and proximate result of Defendants' negligent supervision, Plaintiff suffered monetary damages in excess of three hundred fifty thousand dollars ($350,000.00).

**EIGHT CAUSE OF ACTION**
**(Florida Securities Investor Protection Act against - All Defendants)**

151. Plaintiff repeats and realleges each and every allegation set forth in Paragraphs

"1" through "101" above, with the same force and effect as if set forth fully herein.

152. Pursuant to Section 517.301 of the Florida Securities Act, it is unlawful and a violation of the Act for any person (or entity), in connection with the offer, sale or purchase of an investment or security, to either directly or indirectly employ any device, scheme or artifice to defraud, or obtain money by means of any untrue statement of material fact or omission to state a material fact, or engage in any transaction, practice or course of business which operates as a fraud or deceit upon a person.

153. At all relevant times, in connection with recommending and selling the UBS V10 to Plaintiff, UBS represented that the UBS V10 would produce high yields (from 7 to 15 percent per annum) while offering full capital preservation.

154. At all times relevant hereto, in connection with the offer and sale of the UBS V10, UBSF represented that the UBS V10 satisfied the portfolio parameters set by Plaintiff.

155. Defendants failed to fully disclose the true and accurate information regarding the UBS V10, failed to fully disclose the true inherent and known risks associated with the UBS V10 that Defendants on their own initiative recommended to Plaintiff; and Defendants failed to disclose the significant fees and commissions charged on Plaintiff's UBS V10 investments and on the Plaintiff's investments Defendants made in conjunction with the UBS V10 investment.

156. At all relevant times, Plaintiff used the information provided by Defendants in considering whether to approve the recommended investments. Moreover, Plaintiff approved the investments made by Defendants based upon the information provided by them.

157. Due to Plaintiff's lack of knowledge of and lack of experience in the UBS V10 structured product, Plaintiff justifiably relied on the professed knowledge, expertise, and experience of Defendants, as well as on the information contained in UBSF's marketing

material, which Defendants emailed to Plaintiff, along with representations and assurances UBSF and its employees gave to Plaintiff.

158. Plaintiff asserts that Defendants violated the Florida Securities Act by consistently misrepresenting (and/or omitting) important information about Plaintiff's UBS V10 holding; by misrepresenting that the UBS V10 had certain investment properties; misrepresenting the amount of profit Plaintiff was enjoying in his UBS V10 holding; by inflating the projected yield Plaintiff's investment in the UBS V10 would produce for the year; and by committing the acts/omissions set forth with particularity above.

159. Plaintiff asserts that Defendants' acts and omissions were motivated by a desire on Defendants' part to earn exorbitant fees, commissions and profits from Plaintiff's investments. As a result of acting primarily with its own self-interest in mind, Defendants did not exercise that degree of care required of an investment advisor, broker, dealer, and/or representative in its position.

160. Plaintiff did not and could not have discovered the actionable conduct alleged herein until well after the time that Plaintiff assumed control over his investment portfolio and until well after that time that Plaintiff sustained injury as a result of Defendants continuing failure to disclose information coupled with their active concealment of material facts.

161. As a direct and proximate result of Defendants' violation of the Florida Securities Investor Protection Act, Plaintiff has been severely damaged, and has suffered monetary damages in excess of three hundred fifty thousand dollars ($350,000.00).

**NINTH CAUSE OF ACTION**
**(Violation of RICO Act 18 U.S.C. § 1962(a) & (c) against - All Defendants)**

162. Plaintiff repeats and realleges each and every allegation set forth in Paragraphs "1" through "101" above, with the same force and effect as if set forth fully herein.

163. Plaintiff and Defendants are "persons" within the meaning of 18 U.S.C. §

1961(3). In addition, Defendants UBSF and UBS Bank are "enterprises" within the meaning of 18 U.S.C. § 1961(4).

164. Defendants both as persons and enterprises engaged and continue to engage in activities that affect interest commerce.

165. Pursuant to Section 1962(a) of the RICO Act, "[i]t shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

166. Furthermore, Section 1962(c) of the RICO Act states "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

167. At all times relevant hereto, Defendants were engaged in the process of communicating with Plaintiff via, telephone, email, and regular post.

168. During the commission of the above referenced events, Defendants and or their agents were not only located throughout Florida, but also in New York and Utah. Moreover, while Defendants were located in those areas they used the means of telephone, email and regular postal service to communicate with Plaintiff.

169. Section 1961(1)(B) describes "racketeering activity" as both mail fraud pursuant to 18 U.S.C. § 1341 and wire fraud 18 U.S.C. § 1343.

170. Plaintiff avers that Defendants conspired amongst each other to commit mail and wire fraud against Plaintiff but also actually did commit mail and wire fraud against Plaintiff by

the following:

i. Failing to fully disclose the true and accurate information regarding the UBS V10;

ii. Failing to fully disclose the true inherent and known risks associated with the UBS V10 that UBSF on its own initiative recommended to Plaintiff; Failing to to disclose the significant fees and commissions charged on Plaintiff's UBS V10 investments and on Plaintiff's investments UBSF made in conjunction with the UBS V10 investment;

iii. Misrepresenting the amount of profit Plaintiff was enjoying in his UBS V10 holding;

iv. Inflating the projected yield Plaintiff's investment in the UBS V10 would produce for the year;

v. Soliciting and enticing Plaintiff into a loan from UBS Bank;

vi. Leading Plaintiff to believe that the loan was unsecured when it was actually secured by all of his liquid accounts;

vii. Fraudulently changing the name of the entity on the UBS Bank loan documents;

viii. Using the loan from UBS Bank through Plaintiff for UBSF investments like the UBS V10 in violation Regulations U and T of the Code of Federal Regulations;

ix. Requiring Plaintiff to follow a shockingly bizarre procedure in order to unload his shares in the UBS V10;

x. Locking Plaintiff out of his accounts;

xi. Charging exorbitant, interest, costs, and fees on the transaction in which

Defendants not only solicited but required Plaintiff to follow in order to regain control over his funds.

171. Defendants continuously engaged in this pattern of racketeering activity based on the aforementioned actions in the above paragraph.

172. Plaintiff has suffered injury as a result of the racketeering activities exhibited by the Defendants both individual and collectively as more fully explained in the fact section of this Complaint.

173. Pursuant to Section 1964(c) Plaintiff is suing Defendants to recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's.

**TENTH CAUSE OF ACTION**
**(Intentional Infliction of Emotional Distress against - All Defendants, excluding UBS Bank)**

174. Plaintiff repeats and realleges each and every allegation set forth in Paragraphs "1" through "101" above, with the same force and effect as if set forth fully herein.

175. Defendants stood in fiduciary relationship to Plaintiff acting as an investment advisor, broker, dealer and/or representative for and on behalf of Plaintiff.

176. At all relevant times, Defendants had a close relationship with Plaintiff through which they acquired influence over Plaintiff's investments and financial affairs, and through which they exercised dominion and control over Plaintiff's investment portfolio and Plaintiff placed confidence and trust in them.

177. Defendants set out on a path to hinder Plaintiff's ability to uncover their misdealings and recuperate from the losses they caused him to incur when Plaintiff began to inquire about the misrepresentation regarding the UBS Bank loan, the investment in the UBS V10, and the shockingly bizarre and extreme procedure he was required to undergo in order to sell his shares in the UBS V10.

178. Defendants knew of Plaintiff's injuries and how they affected his mental and emotional health. Regardless, Defendant sought to use Plaintiff's weakened mental and emotional state against him with the intent to cause further infliction of distress.

179. Plaintiff avers, that at all times relevant hereto, Defendants intentionally inflicted emotional distress when Defendants knowingly, intentionally and willfully committed the following extreme, outrageous and shocking acts:

i. Intentionally placed Plaintiff's portfolio at risk and intentionally caused Plaintiff's portfolio to suffer losses through fraudulent means, with the knowledge that Plaintiff had just recovered from a similar position at Merrill and with the knowledge and appreciation of the effect that the experience at Merrill had on Plaintiff's physical and emotional sensitivities with full knowledge of and flagrant disregard for Plaintiff's sensitivities engendered by a debilitating injury;

ii. Intentionally exacted a series of retaliatory measures against Plaintiff regarding the access to his accounts and the sale of the securities with the UBS V10 coupled by calling the UBS Bank loan due immediately;

iii. Subjecting Plaintiff to almost daily coordinated harassment from July 8, 2010 until November 2, 2010;

iv. Intentionally misused authority over Plaintiff's investment portfolio by purposefully failing to timely address the concerns, requests, and complaints without cause or justification and continued in this outrageous behavior for approximately two years;

v. Freezing Plaintiff's assets including his personal funds for an extended period of time;

vi. Threatening Plaintiff with the intent to cause maximum harm to Plaintiff's portfolio;

vii. Intentionally leaving Plaintiff's portfolio without an investment advisor to manage Plaintiff's investments for a period of months and during the most critical period following the discovery of Defendants fraud and misrepresentation.

viii. Purposefully preventing Plaintiff access to any information regarding the financial condition of Plaintiff's investment portfolio, and with no means for Plaintiff to hedge or safeguard Plaintiff's portfolio;

ix. Systematically and continuously manufacturing unjustifiable reasons to deny Plaintiff the ability access his assets with the intent to inflict emotional stress on Plaintiff, and

x. Engaging in series of coordinated acts which in their totality are shocking and extreme to the conscious of a civilized society.

180. The actions of Defendants demonstrated a lack of care towards the Plaintiff and which exhibited a deliberate attempt to injure Plaintiff to such an extent that the Defendant's actions rise to the level of an intentional tort.

181. Plaintiff had no means of preventing actionable conduct by Defendants as explained in the paragraphs above.

182. As a direct and proximate result of Defendants aforementioned intentional actions Defendants did knowingly and purposefully inflict emotional distress upon Plaintiff thereby causing injury.

**WHEREFORE,** Plaintiff Walter Michaelson, demands compensatory damages and exemplary damages against Defendants UBS, UBSF, Smith, Grandstaff, Richards, and

Beadle as follows:

A. As to the first claim for violation of the Exchange Act, judgment against all Defendants for a sum in excess of three hundred fifty thousand dollars ($350,000.00);

B. As to the second claim for a violation of the Exchange Act, judgment against Defendants UBSFS, Smith, Grandstaff, Richards, and for a sum in excess of three hundred fifty thousand dollars ($350,000.00);

C. As to the third claim for control person liability, judgment against Defendants UBSF and Grandstaff for a sum in excess of three hundred fifty thousand dollars ($350,000.00);

D. As to the fourth claim for negligence, judgment against Defendants UBS Bank, UBSFS, and Smith for a sum in excess of three hundred fifty thousand dollars ($350,000.00);

E. As to the fifth claim for breach of fiduciary duty, judgment against all Defendants for a sum in excess of three hundred fifty thousand dollars ($350,000.00);

F. As to the sixth claim for common law fraud, judgment against all Defendants for a sum in excess of three hundred fifty thousand dollars ($350,000.00);

G. As to the seventh claim for failure to supervise, judgment against Defendants UBS, UBSFS, Grandstaff and Richards for a sum in excess of three hundred fifty thousand dollars ($350,000.00);

H. As to the eighth claim for violation of the Florida Securities Act against Defendants UBSF, Smith, Grandstaff, Richards and Beadle for a sum in excess of three hundred fifty thousand dollars ($350,000.00);

I. As to the ninth claim for violation of Federal RICO Act, 18 U.S.C. § 1962(a) & (c) against all Defendants for a sum in excess of three hundred fifty thousand dollars

($350,000.00);

J. As to the tenth claim for intentional infliction of emotional distress, judgment against all Defendants excluding UBS Bank, for a sum in excess of one hundred thousand dollars ($100,000.00);

K. As to all claims where appropriate, an award of punitive damages against Defendants in an amount sufficient to address its egregious conduct; and

L. As to all claims, the recovery of all applicable costs, interest, attorneys' fees if applicable under Federal or Florida law, and such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all causes of action asserted herein so triable.

Joseph A. Davidow
Florida Bar No. 65885
**WILLIS & DAVIDOW, L.L.C.**
jdavidow@willisdavidow.com
975 6th Ave. S.
Naples, FL 34102-6753
(239) 465-0531 – Phone